ANDREW L. & HELEN W. COLLINS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Collins v. Commissioner
Docket No. 12480-88
United States Tax Court
T.C. Memo 1990-441; 1990 Tax Ct. Memo LEXIS 458; 60 T.C.M. (CCH) 542; T.C.M. (RIA) 90441; August 15, 1990, Filed *458 Decision will be entered under Rule 155. Murray H. Falk, for the petitioners. Margaret R. Reichenberg and Marlene A. Kristovich, for the respondent. NAMEROFF, Special Trial Judge. NAMEROFF
MEMORANDUM FINDINGS OF FACT AND OPINION This case was heard pursuant to the provisions of section 7443A(b) of the Code [1] and Rule 180 et seq. Respondent determined a deficiency in petitioners' Federal income tax for the taxable year 1986 in the amount of $ 5,185, plus additions to tax under sections 6653(a)(1)(A) and 6653(a)(1)(B) in the amounts of $ 259.25 and 50 percent of the interest due on the entire underpayment, respectively. Respondent also determined that petitioners were liable for an addition to tax under section 6661, but conceded that issue at the commencement of the trial of this case. The issues for decision are 1) whether petitioners are entitled to a charitable contribution deduction in the amount of $ 25,000 for 1986 in connection with purported gifts to Zoe Christian Fellowship (Zoe) and Holy Temple Church of God in Christ (Holy Temple) and 2) whether petitioners are liable for the additions to tax for negligence. Respondent has conceded that petitioners are entitled to *459 a charitable contribution deduction in the amount of $ 3,337 for contributions other than Zoe or Holy Temple. Some of the facts have been stipulated and are so found. The stipulated facts and attached exhibits are incorporated by this reference. At the time of filing of the petition in this case, petitioners resided in Bakersfield, California. Petitioner Helen Collins is an elementary school teacher, teaching the second grade in Bakersfield, where she has taught for 19 years. She has a Bachelor of Science degree in elementary education from Alcorn State University, Lorman, Mississippi, and has done post-graduate work in history at California State University, Bakersfield. Petitioner Andrew Collins is a parts man at a Chevrolet automobile dealership in Bakersfield, where he has been employed for 17 years. He is a high school graduate and has taken a few college courses while in the military service. (He was an air policeman in the United States Air Force from 1963 to 1966.) Petitioner Helen Collins *460 attends church and is engaged in church activities on a regular basis, and has done so for as long as she can remember. She believes in tithing, giving generously to the church, and that charitable deeds should be done in secret. We take judicial notice that tithing is generally considered to be the contributing of one-tenth of one's income to a church. There is no evidence that Mrs. Collins actually gave a the to her church in any other taxable year. Petitioner Andrew Collins does not attend church as regularly as his wife. Shelvin E. Byars (Byars) is a certified public accountant and a former employee of the Internal Revenue Service. Byars was familiar with petitioners' financial status. He first met petitioners at a financial planning workshop in 1984. Byars then became petitioners' tax accountant. He furnished them with tax advice and prepared their tax returns for 1984, 1985, and 1986. In addition to the workshop in 1984, petitioners had financial planning meetings with Byars in 1985. In 1986, a financial planning workbook was prepared by Byars for petitioners. The workbook reflects petitioners' net worth as of October 31, 1986, at $ 52,300, including "retirement assets" *461 of $ 25,000. One recommendation contained in the workbook was for petitioners to attempt to increase their net worth for their retirement years. In the latter part of 1986, Byars informed petitioners of a program whereby petitioners would apparently borrow money from a corporation and would then contribute the same money back to qualifying churches. Byars then suggested that petitioners borrow and contribute $ 25,000. First, petitioners were required to execute a document entitled "promissory note," wherein petitioners would promise to pay the borrowed amount to the order of Layman Investors Corp. (Layman) on or before April 15, 1990. The note provided that if the principal sum was paid on or before the due date in accordance with the terms and conditions of a document entitled "promissory note addendum," (the "addendum") then no interest would be payable on the note. Otherwise, the note would carry interest at the rate of 12 percent per annum or the maximum rate allowed by law, whichever is less. The addendum set forth conditions precedent to petitioners' right to obtain loan proceeds. These conditions were: 1) an agreement to pay the loan proceeds to specific organizations; 2) *462 ownership of a passbook account, certificate of deposit or other investment instrument with an entity insured by the Federal Deposit Insurance Corporation for a period of 36 months beginning April 15, 1987, and ending April 15, 1990; 3) the submission of proof of the savings deposit "every six months and each anniversary thereof commencing on June 15, 1987;" 4) the promise by the obligors not to disclose to any third party under any circumstances the terms, conditions, or their involvement or participation in the transaction; and 5) the payment of an administrative fee equal to 2 1/2 percent of the face amount of the loan. The addendum included the following statement: "Payee, at their [sic] sole option, may, without Prejudice of rights, elect to forgive all money due under this agreement, conditioned upon 'Obligor' fulfilling all of the terms and conditions herein above described." On December 1, 1986, petitioners executed a promissory note as described above in the principal sum of $ 25,000 payable to Layman. They also initialed an addendum and sent a check for $ 625 (2 1/2 percent of $ 25,000) to Layman. (The record does not clearly identify the incorporators or owners of Layman; *463 suffice it to say that Byars was deeply involved with Layman.) The addendum which petitioners initialed provided for the payment of $ 10,000 to Holy Temple and $ 15,000 to Zoe[2]. On April 15, 1987, petitioners opened a certificate of deposit account at Guarantee Savings, Fresno, California, in the amount of $ 2,000 for a three year term in the name of Helen Collins and Andrew Collins. In 1986, Zoe and Zoe Christian Leadership Training Center were both divisions of Frank Stewart Ministries, an organization described in section 170(b)(1)(A)(i). Holy Temple is also an organization described in section 170(b)(1)(A)(i). Both organizations had their principal places of business in the greater Los Angeles area. The head pastor for Holy Temple is the father of Byars. Byars was on the financial committees for Zoe, Frank Stewart Ministries and Holy Temple. At no time, other than perhaps through Byars, were petitioners ever directly contacted *464 by or in direct contact with Layman. Petitioners, residents of Bakersfield, Ca., neither attended services at Zoe or Holy Temple, nor had they ever been aware of those organizations' locations or charitable activities, if any. Layman never asked petitioners to provide any financial information as a condition of obtaining the loan, nor did Byars request their permission to disclose their financial status to Layman. In addition, petitioners were not required to provide any security for the note. On December 26, 1986, Layman drew a check (check #1) payable to Zoe in the amount of $ 15,000 on an account maintained at the Beverly Hills Savings and Loan Association (the Layman Beverly Hills account). That check bore the notation "re: Collins, A.& H." Check #1 was part of a withdrawal from the Layman Beverly Hills account of 18 separate checks totalling $ 190,000. On December 29, 1986, that withdrawal was merged with other funds as part of a deposit in the amount of $ 332,000 to a savings account at the Beverly Hills Savings and Loan Association in the name of Zoe (the Zoe Beverly Hills account) which had been opened on December 26, 1986. Immediately prior to the deposit of $ 332,000 *465 on December 29, 1986, the balance in the Zoe Beverly Hills account was $ 3,000. On the same day, $ 332,000 was withdrawn from the Zoe Beverly Hills account and deposited into another account in the Beverly Hills Savings and Loan Association in the name of the Holy Temple Child Development Day Care Center [3] (the Holy Temple Beverly Hills account). Immediately after such withdrawal, the balance in the Zoe Beverly Hills account was again $ 3,000. The Holy Temple Beverly Hills account was opened on December 3, 1986. Also on December 29, 1986, $ 332,000 was withdrawn from the Holy Temple Beverly Hills account and deposited into the Layman Beverly Hills account. Immediately prior to the deposit and after the withdrawal on December 29, 1986 of $ 332,000, the balance in the Holy Temple Beverly Hills account was $ 27. On December 26, 1989, Layman drew a check (check #2) payable to Holy Temple in the amount of $ 10,000 on the Layman Beverly Hills account. That check also bore the notation "re: Collins A. & H.," and was part of a withdrawal from the Layman Beverly Hills account in the amount of *466 $ 184,000. On December 29, 1986, as part of a deposit of $ 164,000, [4] check #2 was deposited into an account at the Founders Savings and Loan Association in the name of Holy Temple Child Development Day Care Center (the Holy Temple Founders account). The Holy Temple Founders account was opened on November 10, 1986 with a deposit of $ 2,500. On December 29, 1986, $ 69,000 was withdrawn from the Holy Temple Founders account and deposited into the Holy Temple Beverly Hills account. Also on December 29, 1986, $ 69,000 was transferred from the Holy Temple Beverly Hills account into the Layman Beverly Hills account. Both before and after the transfer of the $ 69,000 from the Holy Temple Founders account to the Holy Temple Beverly Hills account and then to the Layman Beverly Hills account, the balance of the Holy Temple Beverly Hills account was $ 27. Also on *467 December 30, 1986, $ 184,000 was withdrawn from the Holy Temple Founders account deposited into the Holy Temple Beverly Hills account, withdrawn from the Holy Temple Beverly Hills account and deposited into the Layman Beverly Hills account. After these transactions, the balance in the Holy Temple Founders account was $ 2,774.42. [5] Petitioners were furnished a copy of check #1 and were issued a "Report of Your Contributions to the Church" by Zoe for the year 1986 in the amount of $ 15,000 signed by the pastor's wife. Similarly, petitioners were furnished a copy of check #2 and a letter dated January 10, 1987 from Holy Temple acknowledging a contribution of $ 10,000 for the year 1986. Neither of the petitioners was a signatory on any Layman, Holy Temple, or Zoe account nor had knowledge of what happened to the money represented by checks #1 and #2. There is no credible evidence concerning the motives of Zoe and Holy Temple to engage in these transactions. Reverend Stewart thought that they had something *468 to do with enhancing a balance sheet for credit purposes. We fail to understand such logic. No explanation was given as to why monies were returned to Layman. The parties have agreed that if Byars had been called as a witness, he would have invoked his Fifth Amendment rights against self-incrimination. We can only conclude that the transactions were prearranged as part of a scheme by Byars to enrich himself. Subsequent to the trial and the filing of briefs in this case, petitioners filed a Motion to Reopen Proceedings for Hearing to Determine if Certain Evidence Introduced by Respondent Should be Stricken and to Strike Such Evidence. In conjunction with that motion, the parties filed a fourth stipulation of facts from which the Court finds the following facts: Respondent issued summonses to the Beverly Hills Savings and Loan Association as follows: Date
For Records Of
July 23, 1987
Holy Temple
January 26, 1988
Zoe Christian
August 18, 1988
Layman Investors Corp.
August 18, 1988
Zoe Christian
August 18, 1988
Holy Temple
On March 29, 1989, respondent's counsel issued two subpoenas to the Beverly Hills Savings and Loan Association for bank records relating to the tax liability of petitioners. *469 At trial, respondent's counsel was prepared to introduce certain exhibits obtained through subpoenas; however, the parties had already stipulated to those documents. The subpoenas included some of the same documents as those listed in the summons. The period covered by the subpoena was included in the summons. On August 18, 1988, respondent also issued a summons to Founders Savings and Loan Association. On March 28, 1989, respondent's counsel issued a subpoena to Founders Savings and Loan Association for bank records relating to the tax liability of petitioners. The period covered by the subpoena was included in the summons. But for the stipulation of the parties, respondent's counsel was prepared to introduce certain exhibits through said subpoena. On July 23, 1987, a summons was issued to First Los Angeles Bank for records of Layman Investors Corp. [6] *470 On March 28, 1989, respondent's counsel issued a subpoena to the First Los Angeles Bank for bank records relating to the tax liability of petitioners. On March 18, 1988, Reverend Frank L. Stewart made a sworn statement pursuant to an order of the United States District Court as part of a summons enforcement proceeding. The transcript of said statement was admitted into evidence as an exhibit of respondent. In addition, there were five other summons enforcement cases in the United States District Court involving Layman, Zoe, and Holy Temple, but the requested documents were not provided to respondent. Petitioners' Motion to Reopen is based upon our decision in Universal Manufacturing Co. v. Commissioner, 93 T.C. 589 (1989). In Universal, we held that respondent was prohibited from using in that case any testimony, documents or other information obtained pursuant to administrative summonses issued subsequent to the docketing of that case in this Court. The facts in Universal indicate that respondent issued a notice of deficiency to Mr. Coleman, a majority shareholder of WNC Corporation, on September 19, 1988. Mr. Coleman *471 filed a petition with this Court on December 12, 1988. Respondent issued a notice of deficiency to WNC Corp. and subsidiaries on June 7, 1988. Universal Manufacturing Company, Inc., the successor to WNC Corp., filed its petition on September 2, 1988. On or about January 10, 1989, a special agent of respondent's Criminal Investigation Division served summonses on two employees of WNC Corp. and third-party record-keeper summonses upon two accountants for WNC Corp. On February 13, 1989, both Universal and Mr. Coleman filed motions for protective orders. The taxpayers therein requested the Court to prevent respondent from utilizing in this Court any information obtained pursuant to the summonses. At the time of the hearing on the motions, proceedings to enforce or quash the summonses were pending before three district courts. In Universal, we held that respondent's use of administrative summonses would circumvent our discovery rules. We therefore prohibited respondent from using information in this Court obtained from the administrative summonses issued after the commencement of the Universal case in the Tax Court. Petitioners in the instant case argue that the situation herein *472 is identical to Universal and, accordingly, the proceedings should be reopened in order to exclude information obtained by respondent pursuant to administrative summonses issued after the instant case was docketed. [7] Indeed, petitioners do not know which records were obtained pursuant to administrative summonses. They request the Court to conduct a hearing to determine that information. The problem with petitioners' motion is that they have already stipulated to the admission of records (which may have been obtained by summons) subject only to their objection of relevancy, which will be addressed hereinafter. We find nothing in Universal that would mandate reopening a record to exclude stipulated evidence which may have been improperly obtained. The stipulation would appear to have waived any defenses to admissibility which had not been reserved therein. We now decide whether petitioners are entitled to charitable contributions in 1986 with regard to the transactions described *473 above in connection with Zoe and Holy Temple. Deductions are a matter of legislative grace and taxpayers must satisfy the specific statutory requirements with the deductions they claim. Deputy v. duPont, 308 U.S. 488 (1940); New Colonial Ice Co. v. Helvering, 292 U.S. 435 (1934). Taxpayers have the burden of proving entitlement to the deductions they claim. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a). These rules apply with equal force to deductions claimed for charitable contributions. Thus, petitioners must prove that they made "a contribution or gift to or for the use of" an entity described in section 170(c), "payment of which is made within the taxable year." Section 170(a)(1). Petitioners contend that they borrowed $ 25,000 from Layman and that, on their behalf, Layman issued checks to Zoe for $ 15,000 and Holy Temple for $ 10,000 at the end of 1986, thereby entitling them to the claimed charitable contributions. Petitioners further claim that the use made of these funds by Zoe and Holy Temple is wholly irrelevant to their claimed contributions. We hold that petitioners have not shown that they made a contribution to or for the benefit of a charitable organization *474 as claimed. Pieces of paper were signed and funds flowed from one account to another with lightning speed. But upon close examination, it is apparent that no rights were affected, or were intended to be affected, and no funds in any real sense were transmitted to and received by any charitable organizations. Petitioners were presented with a scheme from Byars. Byars had provided them with a financial plan which suggested in the main that they attempt to increase their assets and net worth for future retirement years. Although their net worth was approximately $ 52,300, in December 1986, Byars convinced them to sign a document purporting to obligate themselves to pay a corporation, of which they had never heard, the sum of $ 25,000 in April 1990, in return for which Byars would obtain for them charitable contribution deductions for monies paid to two church organizations of which they had never heard. Although petitioners were not asked to furnish any financial statement, the $ 25,000 debt was easily arranged. All petitioners had to do was pay a small fee and, four and one-half months later, open a certificate of deposit account in the amount of $ 2,000 for a three-year period. *475 [8] They also promised not to disclose anything pertaining to this deal to anyone. Subsequent to petitioners' signing the promissory note and addendum, funds moved from Layman to Zoe and Holy Temple, among the purported accounts of the churches, and then back to Layman. Zoe and Holy Temple received nothing. The fact that their bank accounts momentarily reflected deposits of petitioners' alleged money was illusory, a mirage. The churches in reality received no funds; they had no use of the funds. Layman thus turned "seed money" into a forest of charitable contributions. Mere machinations will not create a charitable contribution where no funds are actually used by or intended to benefit a charitable organization. In Allen v. Commissioner, 92 T.C. 1 (1989) (on appeal to the Ninth Circuit), we decided a very similar issue. In Allen, the taxpayers purportedly borrowed $ 22,500 from National Diversified Funding Corporation (NDFC). They signed a promissory note payable in 20 years with three percent quarterly interest payments. The taxpayers then *476 endorsed the check from NDFC and used the proceeds to purchase a cashier's check in the same amount payable to National Institute for Business Achievement (NIBA). [9] However, NDFC had obtained its funds from International Business Network (IBN) which had in turn borrowed the funds from NIBA. Thus the money went from NIBA to IBN to NDFC to the taxpayer and back to NIBA. We held in Allen v. Commissioner, supra at 8-9: We have looked to a number of factors to determine whether payment of the charitable contribution has been made. Included in these is whether the charity actually received the gift and whether the purported gift had any value [Citations omitted] * * *. [W]here a taxpayer claims a deduction for a contribution of money or property of value to an organization, we must consider whether the taxpayer parted with and the donee received property or money. * * * [C]onsequently, the net effect of [taxpayers'] $ 22,500 promissory note to NDFC was a mere promise to pay that amount to NIBA. [Citations omitted.] * * * Thus, except with respect to *477 the cash portion of a contribution, the unit was not enriched by a donor's "contribution". The same money was recycled again and again, through the money circle, with essentially no new infusions of cash. Section 170 allows the deduction for "payments" of charitable contributions. In this case, payment would not ultimately be received * * * for 20 years. With the possible exception of [taxpayers'] $ 2,500, NIBA and the interrelated group of entities were in exactly the same position after the contributions as if no contributions had been made.
Similarly, in the instant case, petitioners parted with nothing of value save for the fee that they paid to Layman for getting into this scheme. In addition, no charitable organization benefited by anything petitioners did. The financial position of the charitable organizations before and after the alleged contribution was identical. Neither charitable organization was benefited or enriched in any way in 1986 by petitioners' signing of several pieces of paper. Accordingly, we hold for respondent on this issue. Petitioners argue that all the elements of a gift to a charitable organization have been satisfied, citing Estate of Hite v. Commissioner, 49 T.C. 580, 594 (1968) *478 and DeJong v. Commissioner, 36 T.C. 896 (1961), affd. 309 F.2d 373 (9th Cir. 1962). One of those elements, however, is delivery to a donee of the subject matter of the gift. We do not believe that such element is satisfied when the purported donee immediately returns the purported gift in a prearranged scheme. To hold otherwise would certify a gigantic fraud on the Treasury. Petitioners further argue that evidence of the use of the donated funds by the charitable organizations is totally irrelevant and thus inadmissable. Petitioners cite various cases, revenue rulings and revenue procedures in support of this argument. All of petitioners' authorities are of no avail, for each of them presupposes a bona fide gift or donation. Here there was no such donation. There was merely a scheme to move money around to present an appearance of a donation, when in reality none was made. Therefore, there was no controversial "use" of the donated funds by the charities. We deny petitioners' objection and hold that the evidence is admissable to prove that no bona fide donation was made. We turn now to the question of whether petitioners are liable for additions to tax for negligence. In the *479 instant case, petitioners were approached with a scheme to obtain a charitable contribution deduction of $ 25,000 for virtually no out-of-pocket cost. The charitable contribution had to be made through borrowing money from a corporation of which they had never heard, and contributions had to be made to organizations of which they had no knowledge. They then signed a purported promissory note for $ 25,000 without having to submit any financial data or give any security for the note. They were purportedly obligated to pay the note in three years without interest if they complied with all the addendum's terms and conditions, including a vow of silence. Moreover, the addendum provided that Layman could, if it desired, forgive the entire debt. This is hardly your typical commercial transaction, and we strongly suspect that petitioners knew that they would never have to pay the $ 25,000. Indeed, they did not have enough liquidity at the time of signing the note sufficient to fulfill their obligation. Petitioner Andrew Collins suggested that, if called to pay it, he probably could obtain the money from his retirement funds. We cannot believe that petitioners with limited financial *480 means would willingly incur such a huge debt, in spite of its purported relationship to churches and charitable giving. Negligence, within the meaning of section 6653(a)(1) and (2), has been defined as the "lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." Neely v. Commissioner, 85 T.C. 934, 947 (1985). While petitioners have established that they did not know and could not find out about the circular flow of money, the circumstances under which they "received" the funds to make the "contribution" should have made them suspicious. The tax benefits in excess of their cash investment, the probable interest-free loan, the vow of silence, and the possible forgiveness of the $ 25,000 debt all should have put petitioners on notice that something was amiss. On these facts, no reasonable and prudent person would blindly rely on the advice given. Thus, the additions for negligence should be imposed. To reflect respondent's concessions, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revnue Code of 1986, as amended, and in effect for the year at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The document also provided for a payment of $ 300 to "word counselors" by April 15, 1987. No information with regard to this provision has been submitted to the Court.
- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -↩
3. Although not stated in the record, we presume this day care center to be part of Holy Temple.↩
4. It is not clear what happened to the other $ 20,000. Respondent suggests that it was deposited to the Holy Temple Founders account on December 30, 1986. However, there also was a withdrawal from the Layman Beverly Hills account on that date of $ 22,000. The discrepancy, however, is not relevant to the issues in this case. ↩
5. It should be noted that petitioners have not objected to any of respondent's requests for findings of facts as to these various banking transactions on any ground except for relevancy.↩
6. Notwithstanding the parties' stipulation that respondent was prepared to introduce evidence obtained via the subpoena, there is no evidence in the record that relates to First Los Angeles Bank. Therefore this factual finding may be irrelevant. We have left it in because of the possibility that information obtained from compliance may have led to other information which is in the record.
7. The notice of deficiency was mailed on May 6, 1988. The instant case was docketed on June 3, 1988. Therefore, only those summonses issued on August 18, 1988 are relevant for purposes of petitioners' argument.↩
8. The purpose for this requirement was never explained. Petitioners, at all times relevant hereto, had full ownership rights to that account.↩
9. In addition, the taxpayers paid $ 2,500 to NIBA from their own funds. This amount was allowed as a charitable contribution deduction.↩